UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| LAMEX FOODS, INC., <br><br> Plaintiff, <br><br> v. <br><br> AUDELIZ LEBRÓN CORP., AUDELIZ LEBRÓN, in his personal capacity, his wife, and their conjugal partnership, <br><br> Defendants. | Civil No. 09-2275 (JAF) |

**OPINION AND ORDER**

Plaintiff, Lamex Foods, Inc., brings this action in diversity against Defendants, Audeliz Lebrón Corp. ("ALC"), ALC President Audeliz Lebrón, and his wife and their conjugal partnership. (Docket No. 1) Plaintiff seeks (1) payment of debt owed by ALC and Lebrón, as ALC's alleged alter ego, under Puerto Rico law, 31 L.P.R.A §§ 3018, 3025 (2006); (2) preliminary and permanent injunction enjoining Defendants from publicizing false representations about Plaintiff; and (3) declaratory judgment finding Plaintiff, given its business relationship with ALC, not liable under the Puerto Rico Dealers' Contracts statute ("Law 75"), 10 L.P.R.A. §§ 278-278e (2004). (Docket Nos. 1; 17; 32.)

# I.

## **Factual and Procedural History**

We derive the following facts from the parties' pleadings, motions, and exhibits, and from testimony and evidence proffered at the hearings held January 27 and February 4, 2010, (see Docket Nos. 26; 40; 49).

Plaintiff is a multinational corporation organized in Minnesota that, inter alia, facilitates the resale of food from food manufacturers to food vendors worldwide. ALC is a Puerto Rico corporation that resells frozen-food products in Puerto Rico. Plaintiff deals with manufacturers and vendors alike on an order-by-order basis; an ordinary transaction means that a manufacturer offers Plaintiff a certain quantity of a certain food, and Plaintiff finds a vendor to buy same. Plaintiff then assists that sale, including by shipping, insuring, and financing.

In or around February 2007, the president of Plaintiff's U.S. division, Steve Anderson, and other employees met with ALC in Puerto Rico. With them were employees of a food manufacturer, George's Farms, Inc. ("George's"), an Arkansas corporation that processes poultry and sells it to vendors like ALC, both directly and through food brokers like Plaintiff. As is standard in the industry, ALC and George's were meeting to acquaint each with the facilities and practices of the other. ALC contends that at this 2007 meeting, ALC and George's reached a verbal "gentleman's agreement" whereby ALC would develop a market in Puerto Rico for George's product and be the exclusive dealer of George's product on the island.[1]

---

[1] This alleged gentleman's agreement serves as the basis for ALC's Law 75 claim currently pending in Puerto Rico court (see Docket No. 44-2) and as a basis for ALC's stance in this case. We note that there is nothing in writing, not even a brief email, confirming any such agreement. While no

Civil No. 09-2275 (JAF)                                                                                                   -3-

Plaintiff, having been present at that meeting, contends that no such agreement was reached. In fact, Anderson specifically recalled ALC having asked, at that meeting and at least one other, for both the exclusive right to distribute George's products in Puerto Rico and the right to use George's logo on ALC's trucks. According to the testimony of Anderson and representatives of George's, George's denied permission as to both.[2]

From around February 2007 until around November 2009, Plaintiff, ALC, and George's maintained a business relationship whereby Plaintiff bought George's product and sold it to ALC on an order-by-order basis.[3] The parties agree that the relationship ran smoothly, though Plaintiff contends, while ALC denies, that ALC occasionally was late making its payments to Plaintiff; Plaintiff on several occasions had to call ALC to "chase the money," which then typically would arrive to Plaintiff's office the following week. An obstacle arose in or around January 2009, when the insurance underwriter that would have covered any credit loss to

---

written instrument is required to form a Law 75 dealer's contract, see, e.g., R.W. Int'l Corp. v. Welch Food, Inc., 13 F.3d 478, 483 (1st Cir. 1994), it strains the imagination to believe that such an agreement existed when not a single mention of it was made in any communication between the parties from 2007 until ALC's counsel sent the letter, presumably in anticipation of litigation, discussed infra note 3.

[2] Having heard the testimony of the principal actors, both Anderson and Lebrón, we afford credibility to Anderson, which was corroborated by the testimony of the George's representatives, and we deny credibility to Lebrón. See, e.g., Remexcel Managerial Consultants, Inc. v. Arlequin, 583 F.3d 45, 50 (1st Cir. 2009) (emphasizing that the trial judge is "in the best position to evaluate the good faith and credibility of the parties"); Limone v. United States, 579 F.3d 79, 98 (1st Cir. 2009) ("[T]he district court must be given wide rein to assess the evidence and judge the credibility of witnesses . . . ." (quoting United States v. Natanel, 938 F.2d 302, 313 (1st Cir. 1991))).

[3] While ALC contends that it was under an obligation to purchase any amount of product George's provided, it has adduced no evidence of any such obligation other than a letter from ALC's in-house counsel dated November 10, 2009, presumably in anticipation of ALC's Law 75 lawsuit. (Docket No. 1-5.) Said contention was squarely denied by George's and Plaintiff, in letters from their respective counsel. (Docket Nos. 1-2; 1-6.)

Civil No. 09-2275 (JAF)                                                                                         -4-

Plaintiff in dealing with ALC dropped ALC from its coverage.[4] In accordance with its corporate policy, and in an effort to maintain its business relationship with ALC, Plaintiff requested from ALC a replacement security. ALC offered Plaintiff a standby letter of credit worth $500,000 signed on First Bank, a Puerto Rico financial institution. In addition, ALC required from Plaintiff an extra matching unsecured credit for $500,000, for a combined total of $1 Million. Because Plaintiff's corporate policy prohibited such matching, Anderson encumbered his personal funds to provide ALC that matching credit, again in an effort to preserve Plaintiff's relationship with ALC.

In or around November 2009, ALC stopped paying Plaintiff altogether. Without paying, ALC received from Plaintiff shipments of frozen poultry totaling $1,287,911.13 in value. Near the end of December 2009, due to ALC's delinquent account, Plaintiff stopped shipment on various orders of poultry headed to ALC in Puerto Rico. Plaintiff subtracted those stopped shipments from ALC's outstanding balance, but Plaintiff is currently paying to cold store that poultry in Arkansas, Florida, and Puerto Rico.[5] In addition to the value of poultry due Plaintiff,

---

[4] Plaintiff could offer no explanation for the underwriter's decision to terminate coverage; Lebrón testified that widespread credit problems in Puerto Rico, not specific to ALC, precipitated said termination.

[5] After ALC's account with Plaintiff was frozen due to nonpayment, Plaintiff attempted to sell that poultry to another food vendor akin to ALC in Puerto Rico, Trafon Group. While Plaintiff's employees met with Trafon Group representatives, however, Trafon Group received a letter from ALC threatening legal ramifications from Trafon Group's potential deal with Plaintiff. Trafon Group responded to Plaintiff by offering to buy the poultry if Plaintiff agreed to hold Trafon Group harmless in the event of suit by ALC. In accordance with its corporate policy, Plaintiff was unable to oblige. This incident forms the basis of Plaintiff's claim that ALC is heading a "smear campaign" against them in Puerto Rico and is damaging Plaintiff's business reputation on the island. At the very least, this incident supports Plaintiff's claim for cold-storage costs incurred in relation to the disputed merchandise.

ALC owes interest, calculated under Plaintiff's terms and conditions of sale at 1.5% a month and assessed each month ALC's account is in arrears.[6]

Plaintiff actively and informally attempted to collect payment from ALC. Anderson called, wrote emails, and even traveled to Puerto Rico to meet with Lebrón in order to discuss ALC's delinquent account. Lebrón did not respond to any correspondence and did not meet with Anderson. Having given ALC "every opportunity" to settle the matter, Plaintiff cashed in the First Bank $500,000 letter of credit and filed the instant suit in this court. Meanwhile, ALC filed suit in Puerto Rico court, naming as defendants Plaintiff, George's, and First Bank, among others, and alleging violations of Law 75. During the course of the Puerto Rico suit, ALC has consigned a sum of $785,097.14 to the San Juan Civil Superior Court pending resolution of the parties' payment dispute. (See Jan. 27, 2010 Hr'g Def. Ex. 2.)

Plaintiff filed suit in this court seeking payment of monies owed it by ALC, alleging that Lebrón should be held personally liable for ALC's debt should ALC be unable to pay in full. Plaintiff also seeks declaratory judgment stating that it is not liable in these circumstances under Law 75. Plaintiff also moved for preliminary and permanent injunction enjoining Defendants from continuing to damage its business reputation in Puerto Rico.

---

On February 4, 2010, pursuant to our Order reopening the record for this limited purpose (Docket No. 48), we held a brief evidentiary hearing to receive evidence regarding the alleged cold-storage costs and to allow Defendants to challenge same.

[6] As of the filing of its complaint, Plaintiff claimed the total damages attributable to ALC were $1,287,911.13 in poultry delivered to ALC, plus interest on that amount, calculated at 1.5% for every month ALC's account is in arrears, plus costs Plaintiff incurred in cold storage, totaling $56,692.12 (see Docket No. 47), plus any losses due to inability to promptly resell, see supra note 5. (Docket No. 1 at 15.)

Civil No. 09-2275 (JAF)                                                                                    -6-

On January 14, 2010, this court held its first hearing in this case, to reconsider, on Plaintiff's motion, its order granting Defendants extended time to answer Plaintiff's complaint. At that hearing, the parties agreed to a streamlined discovery process whereby each would depose the other's witness and the parties would exchange all relevant documents by a certain date and time. On January 20, however, we received notice via cross informative motions that the depositions were not taken as agreed. Upon review of the transcript of Lebrón's deposition, which Defendants truncated due to their refusal to discuss any element of Plaintiff's case save the disputed funds, we found that Defendants were obstructing the discovery process.

At a status conference called to discuss said informative motions, we ordered Defendants to pay all costs for the impeded depositions. We also warned Defendants that we viewed their litigation strategy as one merely meant to delay and to frustrate a good-faith resolution of the matter, a strategy that contravenes both the parties' and the public's commercial and judicial interests. In an effort to curtail that misuse of the judiciary's time, we advanced the date of the preliminary injunction hearing in what appeared to us to be a simple and straightforward controversy of easy resolution. At the beginning of said hearing, held January 27, we further notified the parties that we were poised to treat the preliminary injunction hearing as a trial on the merits.[7] At the close of the hearing, having solicited and received no objection from the

---

[7] Federal Rule of Civil Procedure 65(a)(2) allows this court to convert a preliminary injunction hearing into a trial on the merits. Our notice to the parties of our intention to do so, including by our January 20 order granting consolidated consideration of Plaintiff's motions for preliminary and permanent injunction (Docket No. 26), along with our solicitation of any other relevant evidence and of objections to consolidation, satisfies us that the parties were aware of what was at stake during the hearing and that they provided all evidence available and relevant to this decision on the merits. See Francisco-Sánchez v. Esso Standard Oil Co. (P.R.), 572 F.3d 1, 15 (1st Cir. 2009) (requiring notice to

Civil No. 09-2275 (JAF) -7-

parties, we concluded that we had received sufficient factual evidence to determine the merits of Plaintiff's claims. This Opinion and Order constitutes our Federal Rule of Civil Procedure 52(a) findings of fact and conclusions of law.

## II.

### Diversity Jurisdiction and Substantive Law Applied

This court has "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a)(1). In diversity cases, "the substantive law of the forum state controls." Martínez-Serrano v. Quality Health Servs. of P.R., 568 F.3d 278, 285 (1st Cir. 2009) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)); see 28 U.S.C. § 1652. "For this purpose, Puerto Rico is treated as the functional equivalent of a state." Id. (citing Rolón-Alvarado v. Municipality of San Juan, 1 F.3d 74, 77 (1st Cir. 1993)). Because the instant case is in diversity, we apply Puerto Rico law in deciding the merits of Plaintiff's claims.

---

parties of court's consolidation intention, so as to give parties fair opportunity before decision to exhaust their arguments on the merits).

Civil No. 09-2275 (JAF)                                                                                                -8-

## III.

## Analysis

### A.   Payment Dispute

Plaintiff seeks to collect payment from ALC of monies owed and losses incurred due to ALC's default on its contractual obligation, see 31 L.P.R.A. §§ 3018, 3025.[8] (Docket No. 1.) ALC does not dispute that it owes Plaintiff for poultry ALC received from Plaintiff;[9] instead, ALC has taken upon itself to hold these overdue funds in abeyance, diverting the monies to a Puerto Rico court and effectively conditioning the release of same to the resolution of an obviously meritless Law 75 claim that will take years to resolve.  We find, given ALC's stipulation as to the amount past due to Plaintiff for poultry ALC received, that those funds are due and owing, save the $500,000 Plaintiff already received by way of the First Bank line of credit.  Thus, we order ALC and the Puerto Rico court, to the extent funds owed Plaintiff are held by each, to release those funds to Plaintiff.

---

[8] Under statute, "[t]hose who in fulfilling their obligations are guilty of fraud, negligence, or delay, and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnify for the losses and damages caused thereby." 31 L.P.R.A. § 3018.  In addition, "[s]hould the obligation consist in the payment of a sum of money, and the debtor should be in default, the indemnity for losses and damages, should there not be a stipulation to the contrary, shall consist in the payment of the interest agreed upon." Id. § 3025.

[9] The parties submitted to the court a joint exhibit displaying the loads of product ALC "picked up from the port" and the payments due thereon.  (See Docket Nos. 1-4; 43.)  While Lebrón, at the January 27 hearing, contested one delivery listed on said exhibit, he did so offering no proof that he had before disputed that charge and no reason for why it nevertheless appeared on his joint exhibit.  Given the contract terms between Plaintiff and ALC, namely that disputes as to deliveries were waived if not raised within five days of delivery, we find ALC's contention untimely, in addition to being unsubstantiated.

As to the cold-storage costs Plaintiff has incurred for storing product originally intended for delivery to ALC but diverted due to ALC's nonpayment, we hold that said costs constitute damages caused by ALC. As such, ALC must reimburse Plaintiff for same.

As to Plaintiff's request that we pierce ALC's corporate veil and thereby hold Lebrón jointly and severally liable for ALC's obligation to Plaintiff, we find that Plaintiff has adduced no evidence that such piercing is required in this case. Under Puerto Rico law,[10] a "plaintiff hoping to persuade a court to pierce the corporate veil must establish that . . . the creditor cannot collect from the corporation the debt owed them." Wadsworth, Inc. v. Schwarz-Nin, 951 F. Supp. 314, 322 (D.P.R. 1996) (citing Fleming v. Toa Alta Dev. Corp., 96 P.R. Dec. 240, 243 (1968)); see also Dep't of Consumer Affairs v. Alturas de Fla. Dev. Corp., 1993 P.R.-Eng. 840,226 (P.R. 1993) (stating that corporate entity shall be ignored only "if . . . necessary to prevent fraud or the accomplishment of an illicit purpose, or to prevent an injustice or a wrong" (quoting Cruz v. Ramírez, 75 P.R. Dec. 947, 954 (1954))). Since Plaintiff has made no showing that ALC is unable to fulfill its financial obligations, we find no need to take the extraordinary step of piercing the corporate veil so as to hold Lebrón personally liable for ALC's debt obligations.

---

[10] Puerto Rico choice-of-law rules, which apply in cases brought in diversity before this court, dictate that Puerto Rico law applies to the question of whether to pierce the corporate veil in cases like the one at hand. See, e.g., Wadsworth, Inc. v. Schwarz-Nin, 951 F. Supp. 314, 320-22 (D.P.R. 1996) (analyzing Puerto Rico choice-of-law rules in a similar context, involving contract for sale of goods to be delivered to and sold in Puerto Rico by a Puerto Rico corporation).

**B.    Declaratory Relief as to Law 75**

Plaintiff seeks declaratory judgment finding that it cannot be held liable under Law 75. This court, in a "case of actual controversy within its jurisdiction . . . [and] upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . ." 28 U.S.C. § 2201. Having that authority, we now turn to Law 75 to determine whether we can grant the declaratory relief sought by Plaintiff.

Law 75 envisions a dealer that, by incurring costs, creates a market in Puerto Rico for a principal's product. See, e.g., San Juan Mercantile Corp. v. Canadian Transport Co., 8 P.R. Offic. Trans. 218 (1978) (defining "dealer" under Law 75); see also 10 L.P.R.A. § 278. "The express purpose of [Law 75] was to remedy the damages caused by the abusive practices of manufacturers who arbitrarily eliminated dealers as soon as they created a favorable market for their products and services." San Juan Mercantile Corp., 8 P.R. Offic. Trans. ¶ 6 (citing Warner Lambert Co. v. Tribunal Superior, 1 P.R. Offic. Trans. 527 (1973)). By no stretch of the imagination can ALC and Plaintiff's relationship be deemed that of principal/dealer under Law 75. For starters, Plaintiff deals with various clients within Puerto Rico and does not rely on ALC to create a market for its services. ALC, in these circumstances, simply is not a "dealer" under Law 75. See id.

### C. Injunctive Relief as to Plaintiff's Business Reputation

Plaintiff claims that ALC has spearheaded a smear campaign against it, thereby frustrating Plaintiff's business opportunities in Puerto Rico.[11] The only evidence adduced as to this issue showed that ALC informed one prospective client of Plaintiff's, Trafon Group, that ALC had pending a legal action involving the goods Plaintiff had for sale. Furthermore, Lebrón testified that, when asked by other members of the industry about ALC's relationship with Plaintiff and George's, he had responded that said parties were involved in a pending legal dispute. Absent further evidence as to the existence of a "smear campaign" with financially and reputationally damaging effect, we find no injunctive relief warranted in this case.

## IV.

## Conclusion

For the reasons stated herein, we hereby:

**ORDER** ALC to **pay the total amount due** to Plaintiff, **equaling** the amount of product delivered by Plaintiff to ALC, which totals $1,287,911.13, **plus** interest due thereon at the contractual rate of 1.5% per month for each month ALC's account was in arrears, **plus** cold-storage costs incurred by Plaintiff for product originally designated for sale to ALC but undeliverable due to ALC's delinquent account, which totals $56,692.12, **less** the amount received via First Bank's letter of credit, and **less** the amount held by the San Juan Civil Superior Court;

---

[11] While Plaintiff labels ALC's behavior wrongful, Plaintiff at no point specified the legal right that said behavior violates, though it had the opportunity to do so in its complaint, in its supplemental motions for preliminary and permanent injunctive relief, and at the January 27 hearing.

1      **ORDER** the San Juan Civil Superior Court to **release** the $785,097.14 held by it to Plaintiff by first depositing the monies with the Clerk of this Court;

3      **DENY** Plaintiff's request to hold Lebrón personally liable for ALC's contractual obligation;

5      **DENY** Plaintiff's request for preliminary and permanent injunctive relief; and

6      **GRANT** Plaintiff declaratory judgment and find that Plaintiff is **NOT LIABLE** under Law 75 given its business relationship with ALC in this case.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 5th day of February, 2010.

```
                                    s/ José Antonio Fusté
                                    JOSE ANTONIO FUSTE
                                    Chief U.S. District Judge
```